UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
HENG GUO JIN,

                Plaintiff,

   - against -

HAN SUNG SIKPOOM TRADING CORP. and
CHEL CHANG,

                Defendants.
------------------------------------------------------------------x

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 21 2015 ★
BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
13-CV-6789 (CBA) (LB)

**AMON, Chief United States District Judge:**

      This case arises from a wage dispute between a delivery driver and his former employer, a wholesale food supplier based in Queens, New York. On December 3, 2013, the plaintiff, Heng Guo Jin, filed the instant complaint against defendants Han Sung Sikpoom Trading Corp. ("HSST") and Chel Chang, an owner of HSST. Jin alleges defendants failed to pay him overtime and minimum wage as required by the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). He alleges further, pursuant to the NYLL, that defendants failed to pay him spread-of-hours compensation and other wages owed him. Defendants now move for partial summary judgment with respect to the overtime and minimum wage claims. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

**I. The Duration of Jin's Employment**

      Defendant HSST is a wholesale food supplier of grocery stores and restaurants throughout much of the American Northeast. (Defendants' Local Rule 56.1 Statement ("Def. R. 56.1") ¶ 2; Declaration of Chel Chang ("Chang Decl.") ¶ 5.) It imports its goods from Korea, among other places, and stores them at a warehouse in Queens, New York. (Chang Decl. ¶¶ 5-

1

6.) Defendant Chang is and was, at all relevant times, an owner of HSST. (Id. ¶ 4.) Plaintiff Heng Guo Jin was hired sometime during or before October 2007, (Declaration of Roshni Chaudhari ("Chaudhari Decl."), Ex. B ¶ 3), and was fired around November 4, 2013, (Chang Decl. ¶ 8). Although Chang does not say why Jin was fired, Chang mentions that it was not due to any dispute over wages. (Id. ¶ 29.) Jin states that he asked for and was denied overtime pay. (Chaudhari Decl., Ex. E, Deposition of Heng Guo Jin ("Jin Dep.") at 59.) Jin's attorney claims in his brief that Chang fired Jin "because of his repeated requests for overtime." (Plaintiff's Opposition Memorandum ("Pl. Mem.") at 2.)[1] However, nothing in the record supports the contention that he was fired because of that or like requests.

## II. The Nature of Jin's Employment

Jin worked for HSST as a delivery driver, transporting food items from HSST's warehouse in Queens to restaurants and grocery stores in other parts of New York as well as New Jersey and Massachusetts. (Chang Decl. ¶ 9; Jin Dep. at 17, 48-50.) According to Chang, Jin generally drove one of three trucks, each of which weighed more than 10,001 pounds. (Chang Decl. ¶¶ 10-11.) Jin's deposition testimony is not to the contrary. He testified that, on any given work day, he drove deliveries in the "[r]egular freight truck." (Jin Dep. at 28-29.) In his response to defendants' interrogatories, however, Jin claimed he drove the trucks only two to three times per week. (Chaudhari Decl., Ex. B ¶¶ 7-8.)

---

[1] The Court derives the facts recounted here from the parties' submissions as well as the Court's independent review of the record. As defendants correctly note, Jin improperly failed to respond to their Rule 56.1 statement as required by Local Civil Rule 56.1(b). (Defendants' Reply Memorandum ("Def. Reply Mem.") at 1.) Accordingly, unless unsupported or contradicted by the record, the Court considers the facts presented by defendants as admitted. Local Civ. R. 56.1(c); Suares v. Cityscape Tours, Inc., 603 F. App'x 16, 16-18 (2d Cir. 2015); see also Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001) (district courts may not consider as true factual assertions in an undisputed Local Rule 56.1 statement that are unsupported by the record). But the Court will not, as defendants ask, (Def. Reply Mem. at 2), ignore an assertion of fact in the fact section of Jin's brief if it is supported by the record.

HSST also owns a van that weighs less than 10,001 pounds. (Chang Decl. ¶ 13.) Chang does not recall Jin driving the van. (Id. ¶ 14.) Nor does he recall Jin driving deliveries in his personal car, a practice Chang declared not to be accepted practice at HSST. (Id. ¶ 15.) Jin disputes Chang's recollection. He claims he ran deliveries in HSST's van either one to two times per week, (Jin Dep. at 29), or two to three times per week, (Chaudhari Decl., Ex. B ¶ 6). He claims he drove his own car, which weighs under 4,000 pounds, (Affirmation of Stephen B. Irwin ("Irwin Affirm."), Ex. A), at least three times per week to make deliveries to local restaurants, (Chaudhari Decl., Ex. B ¶¶ 10, 12-13; id., Ex. C ¶ 3). Chang paid Jin $600 per week, which Chang claims he "honestly believed" was "adequate and legal." (Chang Decl. ¶ 26; see also Jin Dep. at 57, 69 (stating he was paid "more than $600" per week for all work done).)

### III. Jin's Hours

Jin drove deliveries for HSST five days per week. (Jin Dep. at 36.) He drove deliveries out of state on only some days and that schedule was as follows. Two days out of each week, he would make deliveries in both New York and New Jersey. (Id. at 38-40.) One day out of every two weeks, he would drive deliveries to Boston, Massachusetts. (Jin Dep. at 39.) On occasion, Jin would also make deliveries in Connecticut. (Chaudhari Decl., Ex. F.)

Chang recalls Jin working only 40 to 50 hours per week. (Id. ¶ 9.) Jin recalls otherwise. He claims Chang knew he was working longer hours. (Jin. Dep. at 62-63.) According to Jin, he drove in two shifts on a typical workday. The first shift ran during the day and entailed 27 to 30 deliveries. (Id. at 36-37, 50-52.) The second was an evening shift and involved another one to two deliveries. (Id. at 19-20.) The second shift added to his workday up to two hours and twenty minutes. (Id. at 20-22.) As defendants note, Jin's testimony on how many hours he worked per week is not entirely consistent. However, drawing all reasonable inferences in Jin's

3

favor, as the Court must on summary judgment, the Court interprets Jin's hours to have been as follows for purposes of this motion.[2] On days when Jin drove deliveries only within New York, he began his day at 7 a.m. and ended it at 10:20 p.m., assuming he returned to the warehouse after his first set of deliveries on the late side, at 8 p.m. (See Jin Dep. at 19-22, 35, 76; Chaudhari Decl., Ex. B ¶ 3.) However, two days a week, when Jin had to make deliveries in New Jersey, he would return to the warehouse after his first set of deliveries as late as 9 p.m., (Jin Dep. at 41), and so would end his day at 11:20 p.m., (id. at 19-22; see also 43-44 (suggesting that, on days Jin drove to New Jersey, he sometimes went home at 11 p.m.)). On days when he drove deliveries to Boston, he would arrive at the HSST warehouse in Queens between 3 a.m. and 3:30 a.m. (Id. at 45.) He testified that the drive took five hours each way, with two hours' worth of deliveries in Boston. (Id. at 48.) Again, assuming another two hours and twenty minutes for his second delivery—a generous assumption given that Jin does not suggest he made a second set of deliveries on days he went to Boston—he finished his day at 5:20 p.m. (Id. at 19-22.) Viewed in the light most favorable to Jin, that provides two weekly hours figures. First, in weeks when Jin did not go to Boston, he worked 78.65 hours. Second, in weeks when Jin did go to Boston, he worked 77.65 hours.

## IV. Chang and the Motor Carrier Exemption

Chang claims that, starting in 2005, he came to believe that the so-called Motor Carrier Exemption—a provision explained below—freed HSST from FLSA overtime requirements because of the company's "vehicles and transport operations" and its registration with the

---

[2] Defendants go to some length to point out the inconsistencies in Jin's asserted work hours. (See Def. R. 56.1 ¶¶ 21-43.) However, it is for a jury to decide what, if anything, those inconsistencies say about Jin's credibility. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . .")

4

Department of Transportation ("DOT"). (Chang Decl. ¶¶ 16-18, 20, 27.) He based his belief on several sources: (1) conversations with DOT officials; (2) consultation with an attorney; (3) reading the FLSA; and (4) conferring with owners of similar businesses about how they paid delivery drivers. (Id. ¶¶ 18-25.) He was aware that drivers, like Jin, had to be paid minimum wage. (Id. ¶ 23.)

## STANDARD OF REVIEW

Summary judgment is warranted where the record before the court shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A 'genuine issue' exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 498 (2d Cir. 2001). A court on summary judgment must draw reasonable inferences in the nonmoving party's favor. See Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). It is the "burden of the moving party to show initially the absence of a genuine issue concerning any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (alterations in original omitted) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970)). When the moving party shows the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate the presence of such an issue. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party cannot rest on mere allegations or denials but must instead come forward with specific facts showing that there is a genuine issue for trial. See Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citing Matsushita, 475 U.S. at 587). The Court may consider materials in the record other than those cited by the parties. Fed. R. Civ. P. 56(c)(3). The Court

may also, "[a]fter giving notice and a reasonable time to respond, . . . grant summary judgment for a nonmovant." Id. 56(f)(1).

## DISCUSSION

### I. Jin's Overtime Claims and the Motor Carrier Exemption

Defendants argue that Jin was not subject to the FLSA and NYLL overtime-wage provisions because he fell within the Motor Carrier Exemption ("the Exemption"). (Defendants' Memorandum of Law ("Def. Mem.") at 3-8.) The applicability of that exemption depends upon the size of the vehicle being driven by Jin. As to the facts, it is undisputed that, at all times relevant, Jin drove vehicles weighing more than 10,000 pounds ("large vehicles"). It is a disputed issue of fact whether he at times also drove vehicles weighing 10,000 pounds or less ("small vehicles"). He claims that he did during each workweek at issue. The defendants deny this.

As the Court advised the parties at oral argument, Jin's activities fell within the Exemption for the period December 3, 2007, to June 5, 2008.[3] During that time, the Exemption applied as long as Jin drove large vehicles, even though he may have also driven small vehicles. That changed when a statute titled the SAFETEA-LU Technical Corrections Act ("the Corrections Act") became law, on June 6, 2008. Pub. L. No. 110-244, 122 Stat. 1572. The effect of that act was to make the FLSA overtime-wage provisions specifically applicable to drivers whose work even in part involved operating small vehicles. Since whether Jin drove such vehicles is disputed, defendants are not entitled to summary judgment for the period following the enactment of the Corrections Act. The Court provides more detailed analysis below.

---

[3] The NYLL's statute of limitation stretches back six years. N.Y. Lab. Law § 198(3). In this case, that means Jin's NYLL overtime-wage claims extend to December 3, 2007. (Compl., D.E. # 1 (filed on December 3, 2013).)

### A. The Motor Carrier Exemption

The FLSA provides that any employer who satisfies certain jurisdictional and statutory criteria must pay an employee overtime wages, at a rate of one and one-half times that employee's regular wage rate, for hours worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1). That general rule is subject to a number of exemptions, including the Motor Carrier Exemption. The Exemption does not define its own contours but rather defines its scope by reference to the Motor Carrier Act. Specifically, the Exemption provides that the FLSA's overtime-wage requirements do not apply to employees whose maximum hours of service are regulated by DOT under the Motor Carrier Act. 29 U.S.C. § 213(b)(1). The Motor Carrier Act grants the DOT regulatory power over the maximum hours of service of employees of "a motor private carrier." 49 U.S.C. § 31502(b)(2); see generally Bilyou v. Dutchess Beer Distribs., Inc., 300 F.3d 217, 222 (2d Cir. 2002) (describing the Exemption prior to recent changes). The NYLL's overtime-wage provision, which parallels the FLSA's, has incorporated the Exemption by reference such that the Exemption applies to NYLL overtime-pay claims. See 12 N.Y.C.R.R. § 142-2.2.

### B. The SAFETEA-LU

Prior to June 6, 2008, the FLSA's application to cases like this one was governed by a 2005 amendment to the Motor Carrier Act, the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 1144. The SAFETEA-LU defined "a motor private carrier" as a person who transports goods in large vehicles. See generally McCall v. Disabled Am. Veterans, 723 F.3d 962, 964-66 (8th Cir. 2013); see also SAFETEA-LU § 4142(a), 119 Stat. at 1747; Hamilton v. Newburgh-

Beacon Bus Corp., No. 14-CV-624, 2014 WL 7398908, at *3 (S.D.N.Y. Dec. 4, 2014).[4] That meant that the FLSA's overtime-wage requirements did not apply to a driver whose employment involved operating only large vehicles. However, the text of the SAFETEA-LU did not address circumstances where a driver operated both large and small vehicles. See SAFETEA-LU § 4142(a), 119 Stat. at 1747. Extrinsic sources of statutory meaning are unhelpful. The legislative history of the SAFETEA-LU suggests Congress did not consider the impact of the statute on the FLSA. See H.R. Rep. No. 109-203, at 1004-05 (2005) (Conf. Rep.) (describing section 4142 only in terms of impact on DOT requirements). Nor is agency guidance illuminating. See U.S. Dep't of Labor, Wage & Hour Div., Field Assistance Bulletin No. 2007-2 (merely repeating statutory language). Although the Second Circuit has not addressed the issue, Fox v. Commonwealth Worldwide Chauffeured Transportation, a case from this District, has interpreted the SAFETEA-LU to exempt from the FLSA's overtime-wage provisions an employee who "is likely to be called on" to drive a large vehicle, even though he or she also drives a small vehicle. 865 F. Supp. 2d 257, 266-67 (E.D.N.Y. 2012).

The Fox standard is persuasive for two reasons. First, it is consistent with the well-established standards that govern other elements of the Exemption. See 29 C.F.R. § 782.2(b)(3) (employee is exempt so long as "he is likely to be [] called upon" to perform "safety-affecting activities"); Morris v. McComb, 332 U.S. 422, 431 (1947) (driver is exempt if, on average, 4% of work time "has been, or is likely to be, devoted to services in interstate commerce"). Second, it comports with the policy considerations that historically have guided application of the

---

[4] Specifically, the SAFETEA-LU defined "a motor private carrier" as "a person . . . transporting property by commercial motor vehicle (as defined in section 31132)." See McCall, 723 F.3d at 965-66 (emphasis in original) (internal quotation marks omitted); see also SAFETEA-LU § 4142(a), 119 Stat. at 1747. Section 31132, in turn, defined "a commercial motor vehicle" as a large vehicle. McCall, 723 F.3d at 965 (quoting 49 U.S.C. § 31132(1)(A)).

8

Exemption. Since the 1940s, courts have read the Motor Carrier Act and the FLSA to avoid regulation of a single driver's maximum hours of service by both DOT, which administers the Motor Carrier Act, and the Department of Labor ("DOL"), which administers the FLSA. See Collins v. Heritage Wine Cellars, Ltd., 589 F.3d 895, 901 (7th Cir. 2009). A rule that made a driver subject to DOL maximum-hours authority for hours he operates small vehicles but subject to DOT maximum-hours authority for hours he operates large vehicles "would require burdensome record-keeping, create confusion, and give rise to mistakes and disputes." Id. Nothing in the text, legislative history, or effect of the SAFETEA-LU suggests Congress intended to depart from the traditional policy and practice animating the Exemption.

Applying the rule in Fox, the Court concludes that, from December 3, 2007, through June 5, 2008, Jin fell within the Exemption. It is not disputed that Jin spent some time every week driving large vehicles. Not only was he "likely to be called on" to drive large vehicles in any given workweek; he in fact did drive large vehicles in every workweek at issue. That conclusion is determinative of Jin's overtime claims for this period, which are governed exclusively by the NYLL since they fall outside the FLSA's statute of limitations. See 29 U.S.C. § 255(a) (FLSA claims generally have two-year statute of limitations but limitations period may go back three years if violation of FLSA was willful).

The NYLL provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate . . . subject to the exemptions of . . . the Fair Labor Standards Act of 1938." 12 N.Y.C.R.R. § 142-2.2. As Fox notes, the New York overtime provisions "expressly incorporate the FLSA's exemptions," 865 F. Supp. 2d at 268 (citing 12 N.Y.C.R.R. § 142-2.2), and federal courts have accordingly "appl[ied] FLSA exemptions to state Labor Law claims," including the Motor Carrier Exemption, id. at 268-69

9

(citing Torres v. Gristede's Operating Corp., 628 F. Supp. 2d 447, 456 n.4 (S.D.N.Y. 2008); Khan v. IBI Armored Servs., 474 F. Supp. 2d 448, 450 & n.1 (E.D.N.Y. 2007)). Therefore, although Jin's overtime claims under the NYLL for this period are within the NYLL's six-year limitation period, because he is subject to the Exemption, Jin is not, as a matter of law, entitled to overtime pay at one and one-half times his regular wage rate under the NYLL. The Court therefore grants defendants' motion to the extent they ask the Court to find that Jin is exempt from the NYLL's overtime-wage provisions for work he did prior to June 6, 2008.

However, the same provision of the NYLL creates an alternate remedy for employees subject to the FLSA's exemptions. The NYLL provides that "an employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standard Act," which includes the Motor Carrier Exemption, "overtime at a wage rate of one and one-half times the basic minimum hourly rate." 12 N.Y.C.R.R. § 142-2.2. Jin may therefore seek overtime wages at one and one-half the New York state minimum wage for overtime hours worked from December 3, 2007, through June 5, 2008.

### C. The Corrections Act

The Court, however, denies summary judgment as to Jin's overtime-wage claims falling on or after June 6, 2008. On June 6, 2008, the Corrections Act became law. The Corrections Act amended both the Motor Carrier Act and the FLSA so that a driver is covered by the FLSA's overtime-wage provisions when he spends part of a workweek driving small vehicles and part of a workweek driving large vehicles. Since there are triable issues of fact as to whether Jin drove a small vehicle in each and every workweek after the Corrections Act went into effect, summary judgment is inappropriate.

### i. Text

The Corrections Act did two things pertinent to cases involving drivers of both small and large vehicles. First, section 305(c) of the statute expanded the definition of "motor private carrier" to include a person who transports goods in small vehicles.[5] Corrections Act § 305(c), 122 Stat. at 1620. Because that amendment to the Motor Carrier Act placed small vehicle drivers under DOT's general maximum-hours authority, it would ordinarily have exempted those drivers from the FLSA's overtime-wage provisions. See 29 U.S.C. § 213(b)(1). However, at the same time, section 306(a) of the Corrections Act modified the FLSA. "[N]otwithstanding" the Exemption, the FLSA's overtime-wage requirements "shall apply to a covered employee" who is otherwise subject to DOT's general maximum-hours authority. Corrections Act § 306(a), 122 Stat. at 1620 (codified at 29 U.S.C. § 207 note). As relevant here, the Corrections Act defined a "covered employee" as "an individual":

> (1) who is employed by a . . . motor private carrier . . . ;
> (2) whose work, <u>in whole or in part</u>, is defined—
>     (A) as that of a driver . . . and
>     (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce . . . and
> (3) who performs duties on motor vehicles weighing 10,000 pounds or less.

Corrections Act § 306(c), 122 Stat. at 1621 (emphasis added).

The meaning of this statutory text is plain. Even though a driver is subject to DOT's general maximum-hours regulations, the FLSA's overtime-wage provisions apply to that driver if he spends all or part of his time driving a small vehicle.[6] The mandatory "shall" leaves courts

---

[5] The Corrections Act amended the definition of "motor private carrier" in section 13102 of Title 49 "by striking 'commercial motor vehicle (as defined by section 31132)' and inserting 'motor vehicle.'" Corrections Act § 305(c), 122 Stat. at 1620.

[6] As noted above, historically, jurisprudence surrounding the Exemption sought to avoid having a single driver's maximum hours of service be regulated by DOT some weeks and DOL other weeks. See Part I.B supra. Insofar as the Corrections Act runs counter to that policy consideration, history and policy cannot trump an act of Congress.

no discretion.[7] Nothing in the structure or the legislative history of the Corrections Act suggests an interpretation contrary to the plain meaning of the text of sections 306(a) and 306(c).[8] In sum, under the Corrections Act, drivers who transport goods in both small and large vehicles are subject to the FLSA's overtime provisions.

### ii. Agency Guidance

To the extent statutory text leaves any ambiguity as to the meaning of section 306, agency guidance corroborates the Court's interpretation. Two documents issued by DOL's Wage and Hour Division support the Court's reading of the Corrections Act. See U.S. Dep't of Labor, Wage & Hour Div., Field Assistance Bulletin No. 2010-2, at *2-3 (interpreting Corrections Act to apply FLSA overtime-wage protections to drivers during workweeks in which they in part operate small vehicles even if they also operate large vehicles); U.S. Dep't of Labor, Wage & Hour Div., Fact Sheet # 19, at *2 (2009) (same). The Court finds that this interpretive guidance is entitled to deference under Skidmore v. Swift & Co., 323 U.S. 134 (1944). See Christensen v. Harris Cty., 529 U.S. 576, 587 (2000) (finding DOL opinion letters merit Skidmore but not Chevron[9] deference). Those documents merit Skidmore deference because (1) they are persuasive as consistent with the Correction Act's plain meaning; (2) they are consistent

---

[7] "[I]n whole or in part" does not modify the subsection of the Corrections Act that pertains to "perform[ing] duties" on small vehicles. Corrections Act § 306(c)(3), 122 Stat. at 1621. However, that subsection is most fairly read to say only that an employee is not "covered" simply because his or her job is defined in part by driving small vehicles. The employee must also actually drive a small vehicle. To perform duties on small vehicles does not mean to perform duties exclusively on small vehicles. That reading is consistent with the long-standing canon that "exemptions to the FLSA are 'narrowly construed against the employers seeking to assert them.'" Bilyou, 300 F.3d at 222 (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)).

[8] Sections 305 and 306 came into the Corrections Act through a Senate amendment to the bill originally passed by the House of Representatives. Compare H.R. 1195, 110th Cong. (1st Sess. 2007) (bill initially passed by House without sections 305 and 306), and H.R. Rep. No. 110-62 (2007) (same), with 154 Cong. Rec. S3121-36 (daily ed. Apr. 16, 2008) (text of Senate amendment 4146, which replaced the House bill in full, added sections 305 and 306, and became text of final Corrections Act). The debate on this amendment made no mention of sections 305 and 306 and revolved chiefly around earmarks for highway and transit projects. See, e.g., 154 Cong. Rec. S3046-67 (daily ed. Apr. 16, 2008); id. S3106-36 (daily ed. Apr. 17, 2008); id. H2880-85 (daily ed. Apr. 30, 2008).

[9] Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).

12

with one another and with the week-by-week, employee-by-employee approach generally applied to the Exemption, see, e.g., 29 C.F.R. § 782.2(b)(3); (3) interpretive guidance from the Wage and Hour Division "constitute[s] a body of experience and informed judgment to which courts and litigants may properly resort for guidance," Skidmore, 323 U.S. at 140; and (4) they bear certain indicia of formality, see U.S. Dep't of Labor, Wage & Hour Div., Field Assistance Bulletins, http://www.dol.gov/whd/FieldBulletins (bulletins are developed under the Wage and Hour Division's general authority to administer various laws and provide guidance to DOL investigators and staff members). See United States v. Mead Corp., 533 U.S. 218, 228 (2001) (weight of Skidmore deference depends on "the degree of the agency's care, its consistency [with earlier and later interpretations], formality, and relative expertness, and . . . the persuasiveness of the agency's position").

### iii. Case Law

Finally, the balance of well-reasoned decisional law favors the Court's reading of the Corrections Act. The majority of courts have held that, under the Corrections Act, a driver is covered by the FLSA's overtime-wage provisions when he spends part of a week driving a small vehicle and part driving a large vehicle. See, e.g., McMaster v. E. Armored Servs., 780 F.3d 167, 168-70 (3d Cir. 2015); Hernandez v. Alpine Logistics, LLC, No. 08-CV-6254, 2011 WL 3800031, at *5-6 (W.D.N.Y. Aug. 29, 2011). A minority of district courts have interpreted the Corrections Act to say that any amount of work on a large vehicle exempts a driver from the FLSA's overtime-wage provisions. See, e.g., Jaramillo v. Garda, Inc., No. 12-CV-662, 2012 WL 4955932, at *4 (N.D. Ill. Oct. 17, 2012). But those cases rely erroneously on case law interpreting the SAFETEA-LU and not the Corrections Act. See McMaster, 780 F.3d at 171-72.

In sum, the Court grants summary judgment for the defendants insofar as they ask the Court to find that Jin falls within the Exemption for the time period covered by the SAFETEA-LU, from December 3, 2007, through June 5, 2008. Under that statute a driver who is likely to be called on to drive a large vehicle is exempt from the NYLL's overtime-wage provisions. However, as noted above, Jin may nevertheless seek overtime pay at one and one-half the New York state minimum wage for overtime hours worked during that time. See Part I.B supra.

The Court denies summary judgment for Jin's overtime claims that fall on and after June 6, 2008. Under the Corrections Act, the overtime-wage provisions of the FLSA and the NYLL apply to drivers who spend part of their workweek driving small vehicles, even though they also drive large vehicles. There exist triable issues of fact as to whether Jin drove small vehicles for part of every workweek during the period covered by his complaint.

## II. Good Faith and Willfulness

As stated at oral argument, the Court finds that it would be premature at this juncture, given the paltry record before it, to rule on the issues of willfulness and good faith as they pertain to the statute of limitations for the FLSA claims and liquidated damages pursuant to the FLSA and the NYLL. The Court reserves judgment until a more complete record can be developed at trial and therefore denies defendants' motion with respect to these issues.

## III. Minimum Wage

Defendants also seek summary judgment on Jin's minimum wage claims because his hourly pay met the federal and New York state minimum wage requirements. (Def. Mem. at 8-9.) Jin does not counter this contention. Nor can he. To calculate the effective wage paid for minimum wage purposes, courts in this Circuit divide weekly pay by the total number of hours worked in a given workweek. See Caci v. Wiz of Lake Grove, Inc., 267 F. Supp. 2d 297, 299-

300 (E.D.N.Y. 2003) (citing Rogers v. City of Troy, 148 F.3d 52, 59 (2d Cir. 1998) and collecting cases). Reading the record in the light most favorable to Jin, the greatest number of hours he worked is 78.65 hours, that being during weeks he did not make deliveries in Boston. Jin's $600 per week wage yields an hourly pay rate of $7.63. Federal minimum wage was $7.25 per hour for the years 2010 to 2013, the time potentially covered by the FLSA claim, and minimum wage in New York during the period covered by the complaint was either $7.15 per hour for 2007 to 2009 or $7.25 per hour for 2009 to 2013. U.S. Dep't of Labor, Wage & Hour Div., Changes in Basic Minimum Wages in Non-Farm Employment under State Law: Selected Years 1968 to 2013 (2014), available at http://www.dol.gov/W&HD/state/stateminwagehis.htm. Jin's effective hourly rate was between 38 and 48 cents per hour above minimum wage. Jin's minimum wage claims fail as a matter of law, and the Court grants summary judgment on this issue.

**IV. Extraterritoriality and the NYLL**

Finally, defendants argue that Jin's NYLL claims must fail to the extent they encompass time Jin spent transporting goods to out-of-state buyers. (Def. Mem. at 13-15.) They contend that to hold otherwise would be to apply the NYLL extraterritorially and so to contravene the intent of the New York state legislature. See N.Y. Stat. Law § 149 (imposing general ban on extraterritorial operation of state law); Global Reinsur. Corp. U.S. Branch v. Equitas Ltd., 18 N.Y.3d 722, 735 (2012) ("The established presumption is . . . against the extraterritorial operation of New York law."). Although on the precise facts of this case the law is not especially well developed, defendants' reading of New York law does not persuade the Court.

First, the cases defendants cite to support their theory are not on point. Those cases stand only for the uncontroversial proposition that a state's labor laws do not reach work done entirely

and exclusively outside that state. In O'Neill, pop singer Lady Gaga's former personal assistant argued that she was entitled to overtime under the NYLL for work performed out of state because she was domiciled in New York and her work elsewhere—largely assisting Lady Gaga on international tours—constituted only "temporary assignments." O'Neill v. Mermaid Touring, Inc., 968 F. Supp. 2d 572, 578 (S.D.N.Y. 2013). The court ruled that the NYLL did not protect the personal assistant because she was "laboring" outside New York and her domicile did not control whether the NYLL applies. Id. at 579. Similarly, in Magnuson, the court held that the NYLL did not apply to work done on a television program in Washington, D.C., simply because the defendant production company was incorporated in New York state. Magnuson v. Newman, No. 10-CV-6211, 2013 WL 5380387, at *2, 5 (S.D.N.Y. Sept. 25, 2013). Finally, the NYLL has been held not to apply to work done wholly at the Tokyo branch of a French bank. Hammell v. Paribas, No. 90-CV-4799, 1993 WL 426844, at *1-2 (S.D.N.Y. Oct. 22, 1993).[10] None of these cases addresses the question here: does the NYLL embrace work done by a New York-based employee of a New York company who begins and ends his workday in New York but spends a substantial part of his workday transporting goods to out-of-state buyers?

Second, the New York Court of Appeals has rejected the wooden way in which defendants would answer that question. In Padula v. Lilarn Properties Corp., the court was asked to decide whether the NYLL's workplace-safety provisions applied to a New York resident who

---

[10] Besides these New York cases, defendants cite case law from other jurisdictions. Those cases bear little resemblance to the instant case and, if anything, support a rule contrary to the one defendants put forward. See Peikin v. Kimmel & Silverman, P.C., 576 F. Supp. 2d 654, 657-58 (D.N.J. 2008) (holding New Jersey discrimination laws did not apply to a Pennsylvania-based employee of a Pennsylvania law firm whose practice frequently required her to do work in New Jersey because New Jersey's discrimination law turns on the "state of employment," which in the plaintiff's case was Pennsylvania); see also Jimenez v. Servicios Agricolas Mex., Inc. 742 F. Supp. 2d 1078, 1082-84, 1097-99 (D. Ariz. 2010) (holding California labor law did not apply where work took place entirely in Arizona but noting "that the Legislature may have intended extraterritorial enforcement of wage orders when California residents working for a California employer travel temporarily outside the state during the course of the normal workday but return to California at the end of the day").

16

sustained an injury working for a New York corporation at a property it owned in Massachusetts. 84 N.Y.2d 519 (1994). Although one judge on the Court of Appeals shared the view advanced by defendants in this case, that the court should apply a bright-line rule against application of the NYLL to any conduct taking place outside New York state, id. at 523-24 (Titone, J., concurring), the court engaged in a more flexible analysis and held that "New York's choice-of-law principles govern the outcome of this matter," id. at 521 (majority opinion). Neither party has briefed the choice-of-law analysis called for by Padula. As a result, defendants have not carried their burden on this point, and the Court denies summary judgment on their extraterritoriality argument.

## CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment is granted in part and denied in part.[11]

SO ORDERED.

Dated: Brooklyn, New York
September 18, 2015

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge

---

[11] The Court will not grant summary judgment to nonmovant Jin under Rule 56(f)(1) as to the applicability of the Exemption or whether the NYLL applies to the time Jin spent driving out of state. (See Pl. Mem. 4-5.) There exists a factual dispute over whether Jin drove small vehicles. It is for a jury to decide whether the Exemption applied to Jin during the time period covered by the Corrections Act. Likewise, although defendants failed to carry their burden as to extraterritoriality, that does not mean plaintiff proved that New York law must apply to Jin's out-of-state work. Neither party conducted the correct analysis. Separately, the Court declines defendants' invitation to deem waived Jin's fifth and sixth causes of action, which defendants' motion did not address. (Def. Reply Mem. at 1 n.1.)

17